UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | CAUSE NO. 1:20-cr-116-TWP-DML |
| | ) | |
| RUSSELL TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S THIRD MOTION *IN LIMINE*

The United States of America, by counsel John E. Childress, Acting United States Attorney

for the Southern District of Indiana, and Kathryn E. Olivier and Bradley P. Shepard, Assistant

United States Attorneys, hereby submits its Third Motion *in Limine* requesting that the Court allow

the Government to introduce the evidence seized from the Defendant's house at 1304 Salem Creek

Boulevard on April 29, 2015, during its case-in-chief.

## INTRODUCTION

During the § 2255 litigation involving the Defendant's guilty plea and 2015 conviction,

the Defendant's counsel argued, in essence, that there was not probable cause for the April 29,

2015, search of the Defendant's residence at 1304 Salem Creek Boulevard. Based on those

representations, the Government anticipated that the Defendant would move to suppress the

evidence seized from his residence on April 29, 2015. To date, however, the Defendant has not

filed a motion to suppress. In the interest of efficiency given the upcoming trial date, the

Government is now filing this Motion *in Limine* seeking to introduce the evidence seized from

the Defendant's residence at 1304 Salem Creek Boulevard on April 29, 2015. As set forth

below, there was indisputably probable cause for the search and there is no basis to suppress the evidence.

**FACTUAL BACKGROUND**

**A.     The Charges**

The Defendant has been charged in a 34-count indictment with Sexual Exploitation of a Minor, Coercion and Enticement, Distribution of Visual Depictions of Minors Engaging in Sexually Explicit Conduct, Receipt of Visual Depictions of Minors Engaging in Sexually Explicit Conduct, Possession of Visual Depictions of Minor Engaging in Sexually Explicit Conduct, and Conspiracy to Possess Visual Depictions of Minors Engaging in Sexually Explicit Conduct. (Docket No. 1.)  Simply put, the Government alleges that the Defendant, alone and in conspiracy with other individuals, sexually exploited multiple minor children between roughly 2011 and 2015. The Defendant used hidden cameras in his residences to surreptitiously record minor children in the bathroom, changing clothes, and engaging in sexual activity.  The Defendant's victims were either members of the Defendant's family or friends of those family members and several of the victims have disclosed instances of hands-on sexual abuse by the Defendant.  In addition to the 33 substantive counts, the indictment also alleges that the Defendant conspired with "others known and unknown to the Grand Jury" to possess child pornography.

**B.     Summary of the Evidence**

The Government's evidence at trial will establish that from at least 2011 through the Defendant's arrest on April 29, 2015, a conspiracy existed between the Defendant, his then-wife Angela Taylor,[1] his friend and employer Jared Fogle, and his friends D.L. and R.S.  The purpose

---

[1] Angela Taylor has remarried and now uses the name Angela Baldwin.  For clarity's sake, the Government will refer to her as Angela throughout this document.

of the conspiracy was to possess child pornography to fulfill the deviant sexual desires of the members of the conspiracy. To that end, the Defendant and Angela worked together to place hidden cameras in their residence in order to surreptitiously record minor children fully nude with their genitals exposed and/or engaging in sexual behavior. In addition to reviewing the hidden camera footage himself and with Angela, the Defendant also distributed some of the images and videos that were produced in his home to Angela, to Fogle, and to his other friends and associates, D.L. and R.S.

**C.      The Investigation**

The investigation of the Defendant began in late September or early October 2014, when Jane Doe, a friend and former sexual partner of the Defendant and Angela, told Master Trooper Patrick Etter, a member of the Indiana State Police ("ISP") SWAT team, that the Defendant had offered to send Jane Doe images of young girls. (Exhibit 5, April 23, 2015 Search Warrant, at 16-17 (affidavit ¶ 21).) Upon learning this information, Master Trooper Etter contacted his superiors at ISP, and he was connected to Detective Kevin Getz, a member of ISP's Internet Crimes Against Children unit. (*See id.*) Master Trooper Etter told Detective Getz that his friend, Jane Doe, had received concerning text messages from the Defendant.[2] (*Id.*) Detective Getz then contacted Jane Doe and arranged to interview her at her home on October 3, 2014. (Exhibit 5 at 17 (affidavit ¶ 22).) Sergeant Chris Cecil, a computer and cell phone forensics expert, accompanied Detective Getz to Jane Doe's house on October 3, 2014, in order to extract data from Ms. Doe's cell phone so that it could be analyzed and reviewed. (*Id.*)

---

[2] When Master Trooper Etter spoke to Detective Getz, he characterized Jane Doe as a friend. Sometime thereafter, Master Trooper Etter's relationship with Jane Doe became romantic.

### 1.    The Jane Doe Interview

Detective Getz would testify that when he and Sergeant Cecil arrived at Ms. Doe's house on October 3, 2014, she told them the following:  Ms. Doe originally met the Defendant in approximately 2006, when she was working at Brad's Gold Club – a strip club on the west side of Indianapolis.  Ms. Doe stated that the Defendant was dating another dancer from the club, so he frequently hung out at the club.  Ms. Doe characterized the Defendant as an acquaintance who was more friendly with her deceased husband, who also hung out at Brad's Gold Club.  Ms. Doe indicated that she had lost touch with the Defendant through the years, but she re-connected with the Defendant after her husband died of cancer.  Specifically, Ms. Doe stated that following her husband's death in July 2013, she held onto his cell phone.  At some point in late 2013 or early 2014, the Defendant texted Ms. Doe's husband's cell phone and Ms. Doe responded to let the Defendant know that her husband had passed away.  After that, the Defendant began texting Ms. Doe, and in May 2014, Ms. Doe went bar-hopping with the Defendant, Angela, and some of their friends.

Ms. Doe stated that after she went out with the Defendant, Angela, and their friends, the Defendant began sending Ms. Doe text messages about bestiality.  (*See* Exhibit 5 at 17 (affidavit ¶ 23).) Specifically, the Defendant asked whether his wife, Angela, could come over to Jane Doe's residence and engage in sexual activity with a horse.  (*Id.*)  At the time, Ms. Doe had 4 horses boarded on her property.  (*Id.*)  Ms. Doe stated that she believed the Defendant was serious when he asked whether Angela could engage in sexual activity with Ms. Doe's horses because:  (1) Ms. Doe knew that the Defendant was part of a "swinger" group and she viewed the Defendant as sexually adventurous; and (2) the Defendant discussed the possibility of Angela engaging in sexual activity with horses on multiple occasions.  (*See id.*)  As if to underscore the seriousness of his

inquiries, on September 27, 2014, the Defendant sent Ms. Doe a picture of a woman engaging in sexual activity with a dog. The text message that accompanied the picture stated: "[H]ere's Angie with her ex's dog." (Exhibit 5 at 17 (affidavit ¶ 24).) Ms. Doe believed the woman in the photograph was Angela for 2 reasons. First, she took the Defendant at his word. Second, Ms. Doe told Detective Getz in November 2014, that she had been a sex partner of Angela's, had seen Angela fully nude, and based on the physical attributes of the woman in the photograph, she believed it was Angela. (*Id.*)

Detective Getz would testify that Ms. Doe stated that she initially she thought the photograph of the woman engaging in sexual activity with a dog was funny, but once the Defendant offered to send her pictures of young girls and referenced traveling to Thailand,[3] Ms. Doe became concerned. (*See* Exhibit 5 at 18 (affidavit ¶ 25).)

Ms. Doe stated that she had been to the Defendant's residence and that there was a computer in the residence. (Exhibit 5 at 18 (affidavit ¶ 26).) Ms. Doe also stated that the Defendant had a smartphone. (*Id.*) Detective Getz would testify that one of the most concerning things that Ms. Doe reported was that the Defendant and Angela both had children from prior relationships and at least some of those minor children spent time in the Defendant's home. Detective Getz would testify that he found this fact particularly troubling because it indicated that the Defendant had access to children.

Detective Getz believed that Ms. Doe was a credible witness because her statements were corroborated by text messages and because Ms. Doe was providing information that was

---

[3] Detective Getz knew from his training and experience that Thailand is known for its sex tourism, and individuals who wish to engage in sexual activity with children often travel to Thailand to satisfy their deviant sexual urges.

embarrassing to her personally and so, based on his training and experience, she would have no motivation to lie.

At the conclusion of the October 3, 2014 interview, Detective Getz and Sergeant Cecil took Ms. Doe's cell phone back to the ISP computer forensics lab in order to complete the forensic extraction of the cell phone.  Detective Getz returned Ms. Doe's cell phone to her on October 4, 2014.  (Exhibit 5 at 18 (affidavit ¶ 27).)

Thereafter, Detective Getz reviewed the forensic extraction of Ms. Doe's cell phone (*see id*. at 18-21 (affidavit ¶¶ 28-29)), conducted surveillance on a residence at 1304 Salem Creek Boulevard in Indianapolis that was associated with the Defendant (*id*. at 21 (affidavit ¶ 30)), and verified with the United States Postal Service that the Defendant and Angela both received mail at 1304 Salem Creek Boulevard (*id*. at 21 (affidavit ¶ 31)).  Detective Getz would also testify that he performed open source and Indiana Bureau of Motor Vehicles searches on the Defendant.

  **2.**  **Jane Doe's Cell Phone and the Text Messages between Ms. Doe and Contacts Labeled "Russ Taylor" and "Angela-Russ"**

When he reviewed the forensic extraction of Ms. Doe's cell phone, Detective Getz observed text messages between Ms. Doe and contacts named "Russ Taylor" and "Angela-Russ." (*See* Exhibit 7, Text Messages between Jane Doe and Contact "Russ Taylor"; Exhibit 8, Text Messages between Jane Doe and Contact "Angela-Russ").  The "Russ Taylor" contact was associated with telephone number 317-250-0661 and the "Angela-Russ" contact was associated with telephone number 765-338-6786.  Many of the messages between Ms. Doe, "Russ Taylor," and "Angela-Russ" discussed bestiality, including text messages between "Russ Taylor" and Jane Doe on July 21, 2014:

> RUSS TAYLOR:  Angie is scared you aren't into it and will freak
> if it happens.

JANE DOE:  They are so big it scares me

RUSS TAYLOR:  The cock or horse

JANE DOE:  Both.  Lol!

RUSS TAYLOR:  We seem to think it would allow oral and hand. Are we nieve [sic]?

JANE DOE:  I have no clue.  I have seen a professional breeding and [sic] time and the second time was mini horse in the pasture down the road

RUSS TAYLOR:  So would it be better to do this with a mini horse

(Exhibit 7 at 10 (messages 160-169).)

On September 12, 2014, "Russ Taylor" sent Ms. Doe a GIF depicting a horse preparing to engage in anal intercourse with a woman with the caption "May the Horse Be With You!"  (*See* Exhibit 7 at 14 (message 230).)

On September 17, 2014, Ms. Doe and "Russ Taylor" exchanged text messages planning to meet up and "party":

JANE DOE:  same as last time?

RUSS TAYLOR:  Sure

JANE DOE:  Yay!  So excited!

RUSS TAYLOR:  :-) just us 3 probably.  Is that ok

JANE DOE:  Will we be drinking and doing stuff?

RUSS TAYLOR:  Yup

RUSS TAYLOR:  And each other.  :-)

RUSS TAYLOR:  This was Saturday night

RUSS TAYLOR:  [Photograph of Angela nude and wrapped in an American flag with her breasts exposed and photograph of Angela nude and singing karaoke]

JANE DOE:  fun!  I can't wait

JANE DOE:  Teresa and Jason don't want to go?

RUSS TAYLOR:  We have been steering clear because of legal. Stuff.  Too hot right now

JANE DOE:  But we can have the same kind of fun anyway?

RUSS TAYLOR:  Yep

RUSS TAYLOR:  The 3 of us

RUSS TAYLOR:  Sound ok?

JANE DOE:  Yes

JANE DOE:  Did you want me to bring him?

RUSS TAYLOR:  No

RUSS TAYLOR:  Just you

RUSS TAYLOR:  Angie loved peeing on you and you peeing in her mouth

RUSS TAYLOR:  Thought you were a blast

(Exhibit 7 at 14-15 (messages 231-257).)

Several days later on September 20, 2014, "Russ Taylor" contacted Ms. Doe asking why they had not met up:

RUSS TAYLOR:  What happened.  Thought you were partying with us

JANE DOE:  I am sorry.  I have been insanely sick the past couple days and don't know what is wrong with me

RUSS TAYLOR:  That's okay.  As long as you weren't just blowing us off lol

RUSS TAYLOR:  Angie said check this out.  (In private lol) http://beastythumbs.com/491924511-horse-blowjob.html

JANE DOE:  Definitely not.  I know I wouldn't be able to drink

RUSS TAYLOR:  http://beastiegals.com/624612568-Corridon-de-caballo.html

RUSS TAYLOR:  Click on link or cut and paste on search bar.  :-)

JANE DOE:  Lol!

RUSS TAYLOR:  She may sneak in your barn later

JANE DOE:  What are you guys doing tonight?

RUSS TAYLOR:  I'm driving home from my boys game.  Not sure yet totally.  She had mentioned wanting to play with your horse and partying with you.  Not sure till I get home.

JANE DOE:  I wish I could go out.  I have been throwing up since last night so I know I wouldn't be able to drink

RUSS TAYLOR:  We would only be doing party favors with you. No drinking.  :-)

RUSS TAYLOR:  Do you have a dog?

JANE DOE:  Save them for another night please.  My belly just hurts too bad tonight.  I don't want to keep throwing up

JANE DOE:  No dog yet.  K9 unit took my dog last year after Mitch passed away

RUSS TAYLOR:  Okay.  I think if you can't play we will wait then for another night.  Angie wants to know if you have had your hands on any of your horses cocks yet.  Since we brought it up

JANE DOE:  Lol!  No.  I am shy about stuff like that.  I get embarrassed when they drop them

RUSS TAYLOR:  That's cute.  Lol.  If they've been fixed like yours have been can they still cum.  She's seriously curious.

JANE DOE:  I would think so.  The drive to do that doesn't exist. They were all cut before they reached maturity

JANE DOE:  Maybe the thoroughbred was older when he was cut. They usually don't do that before the racing career ends

JANE DOE:  I have a mare and there has never been any activity from any of the others

9

RUSS TAYLOR:  Angie thinks you're a freak like her though lol. You get embarrassed but will still do stuff with her that's crazy.

RUSS TAYLOR:  She thinks it's probably pointless then to mess with them lol.  She wants to watch it finish.

JANE DOE:  Yeah, I don't think it would be easy to get to that point if it is even possible

RUSS TAYLOR:  We will pull the plug on that then…we know someone who has a dog though that we may borrow.  She wants to know if we have it the night you come over to party if you will play with it with her ?  Or should she get it a different time

RUSS TAYLOR:  I got home.  She's masterbating [sic] lol.

JANE DOE:  Lol!  That would be so awesome to come home to

RUSS TAYLOR:  It is.  What night can you come over

RUSS TAYLOR:  This weekend or during week?

JANE DOE:  Weekend.  I have to work during week

RUSS TAYLOR:  Ok.

RUSS TAYLOR:  We will save our stuff then.  We will get the dog, some restraints, body paint.  Anything else?

JANE DOE:  What kind of restraints?

RUSS TAYLOR:  Lol.  Handcuffs maybe?  Or leather ones to tie you to the bed.

JANE DOE:  I have plenty of handcuffs!  Lol

RUSS TAYLOR:  Okay then we will have you bring them what else that would turn you on

RUSS TAYLOR:  ???

(Exhibit 7 at 15-18 (messages 258-302); *see also* Exhibit 5 at 19-20.)

One week later, on September 27 and into September 28, 2014, "Russ Taylor" reached out

to Ms. Doe inquiring about her plans for the night:

RUSS TAYLOR:  What you up to tonight

JANE DOE:  Ugh nothing fun for me this weekend.  Will next Saturday be good for you?

JANE DOE:  What are you guys doing tonight?

RUSS TAYLOR:  Maybe…I'm home alone for a while.  Was going to have you come party with me…then Angie will be along late.

JANE DOE:  I lost my pic you sent of the three of the girls from last time.  Do you still have it?

JANE DOE:  I wish I could but it is a bad week for me to do anything

RUSS TAYLOR:  I will look for it.  That's okay.  :-)

JANE DOE:  Did you find it?

JANE DOE:  Did you find another girl?  I am sad :(

RUSS TAYLOR:  Lol.  No.  I was looking at porn and masterbating [sic].  Let me send it 4 seconds

RUSS TAYLOR:  [Photograph of 3 partially nude and/or fully nude women engaged in oral sex]

RUSS TAYLOR:  Did you get it

JANE DOE:  Yeah.  I look horrible in it.  Not as good as I remember

RUSS TAYLOR:  Lmao.  You look great.

JANE DOE:  Do you have any more from that night?

RUSS TAYLOR:  I'm sad you didn't come over.  Angie is here wanting to tie you up

JANE DOE:  I wish!

RUSS TAYLOR:  I will look but probably not.  I don't take many normally.  And no faces.  I will look

RUSS TAYLOR:  Are you still sick

JANE DOE:  No.  Not sick.  Monthly time

RUSS TAYLOR:  [Photograph of computer screen showing image of Jane Doe receiving oral sex from Angela]

11

RUSS TAYLOR:  [Photograph of Jane Doe covering her face while receiving oral sex from Angela]

RUSS TAYLOR:  Ohhhhhhhh.  Gotcha

JANE DOE:  Yeah.  Didn't think that would be fun

RUSS TAYLOR:  Lol.  Not so much

JANE DOE:  Any more pics I can masturbate over?

RUSS TAYLOR:  Lol.  Tell me what you want to see.  I got it all

JANE DOE:  Everything

RUSS TAYLOR:  Pics or video?

JANE DOE:  Both?

RUSS TAYLOR:  [Selfie-style photograph of the Defendant and Angela topless laying in a bed and selfie-style photograph of the Defendant and Angela in bed in which the Defendant is sucking on Angela's nipple]

JANE DOE:  I want that

RUSS TAYLOR:  Here's Angie with her ex's dog

RUSS TAYLOR:  [Photograph of black dog licking the nude genitals of an adult woman]

RUSS TAYLOR:  [Photograph of the Defendant engaging in group sex with adult women]

RUSS TAYLOR:  [Photograph of Angela topless in a field wearing fairy wings]

RUSS TAYLOR:  You get them

JANE DOE:  Yeah!  Can I have more?

RUSS TAYLOR:  [Photograph of computer screen depicting group sex between 1 adult male and 2 adult females]

JANE DOE:  I love them!  So hot

RUSS TAYLOR:  Yes.  What.  Type?  Her with dogs, orgy, s and m, young girls, etc

12

> JANE DOE:  Young orgy
>
> JANE DOE:  Any of you and her?
>
> RUSS TAYLOR:  Yes
>
> RUSS TAYLOR:  How young are you ok with?
>
> JANE DOE:  Legal age
>
> RUSS TAYLOR:  Ok
>
> RUSS TAYLOR:  I wanted to ask lol.  Keep in mind we do travel to Thailand on occasion ;-)

(Exhibit 7 at 18-21 (messages 304-352); *see also* Exhibit 5 at 20-21.)

In addition to the text messages between "Russ Taylor" and Ms. Doe, there were also text messages between the Ms. Doe and Angela that discussed, among other things, bestiality.  For example, on May 8, 2014, Ms. Doe and the contact "Angela-Russ" exchanged the following text messages:

> ANGELA-RUSS:  Well do you want to [sic] russ and I tomorrow night
>
> ANGELA-RUSS:  ?
>
> ANGELA-RUSS:  For drinks
>
> JANE DOE:  I want to go somewhere.  You guys pick
>
> ANGELA-RUSS:  Ok I'll talk to him and let ya know

(Exhibit 8 at 4 (messages 66-70).)

The next day, on May 9, 2014, Ms. Doe and "Angela-Russ" exchanged messages about the previous evening:

> ANGELA-RUSS:  Hey it was great meeting you beautiful.  I will let you know if we decide to go out tomorrow.

JANE DOE:  That would be a lot of fun if we can but if another day is best I can try to make that work too.  I have just turned into a homebody, never going out.  I had fun tonight

ANGELA-RUSS:  I had fun too.  Did you make it home safe

JANE DOE:  Sure did.  I assume you guys made it home?

ANGELA-RUSS:  Yes.  We are already in bed.  Lol

(Exhibit 8 at 5 (messages 71-76).)

On May 24, 2014, Ms. Doe and "Angela-Russ" again exchanged text messages alluding to the fact that they had been together the previous night:

ANGELA-RUSS:  Thanks for coming last night

JANE DOE:  I had a lot of fun.  No sleep for me though!  My friend asked me to pick her up at the airport at 1230 :(

ANGELA-RUSS:  Awww :( well try and get some rest sometime soon.

ANGELA-RUSS:  I'm going to sleep now

JANE DOE:  Take the Ambien I gave you

ANGELA-RUSS:  Ok.

JANE DOE:  It will put you to sleep in about 15-20 and you can sleep 2-8 hours

(Exhibit 8 at 5 (messages 86-92).)

On June 21, 2014, "Angela-Russ" and Ms. Doe exchanged text messages in which "Angela-Russ" explicitly discussed bestiality:

JANE DOE:  Hey!  Hope you are having fun I'm [sic] Vegas!  Can't wait to see you again!  You guys will have to come over to play when you guys are home

ANGELA-RUSS:  Ya sounds good.  Get that horse cock ready for me why [sic] russ pounds me from behind and you watch.

JANE DOE:  Any way you want it

14

ANGELA-RUSS:  Will you do whatever I tell you to do

ANGELA-RUSS:  Do you want to be my little dirty girl ?

JANE DOE:  I will do whatever you want ;)

(Exhibit 8 at 6-7 (messages 103-108); *see also* Exhibit 5 at 18-19.)

### 3.    Detective Getz Verifies the Defendant's Address

Detective Getz will testify that after reviewing the text messages between "Russ Taylor," "Angela-Russ," and Ms. Doe, Detective Getz performed open source and Indiana Bureau of Motor Vehicles searches on the Defendant.  Through this investigation, Detective Getz was able to tie the cell phone number 317-250-0661 to the Defendant.  Notably, this was the same telephone number listed as the contact phone number for "Russ Taylor" in Jane Doe's cell phone.

Detective Getz will testify that he also obtained a copy of the Defendant's driver's license photograph, which he compared to the selfie-style photographs of the Defendant and Angela that were sent to Jane Doe on September 27, 2014.  Based on this comparison, Detective Getz concluded that the man in the selfie-style photographs with Angela was the Defendant.

Detective Getz will also testify that the Defendant's Indiana driver's license listed the Defendant's home address as 1304 Salem Creek Boulevard, Indianapolis, Indiana.  Accordingly, Detective Getz conducted surveillance on that residence in approximately October 2014.  (Exhibit 5 at 21 (affidavit ¶ 30).)  During his surveillance, Detective Getz observed 2 vehicles registered to Angela parked in the driveway of the residence at 1304 Salem Creek Boulevard.  (*Id.*)

Finally, Detective Getz confirmed with the United States Postal Service that the Defendant and Angela both received mail at 1304 Salem Creek Boulevard.  (Exhibit 5 at 21 (affidavit ¶ 31).)

#### 4.        The § 2703(d) Orders and Search Warrants

On January 29, 2015, Detective Getz was the affiant on a request for a § 2703(d) order (the "Ping Order") that requested subscriber information, call detail records, and location information for the telephone numbers identified as belonging to "Russ Taylor" (317-250-0661) and "Angela-Russ" (765-338-6786) in Jane Doe's cell phone.  (Exhibit 1, January 29, 2015 Request for Telecommunications Records and Precision Location Order; *see also* Exhibit 5 at 21 (affidavit ¶ 32).)  In the affidavit submitted in support of the Ping Order, Detective Getz identified certain characteristics that, based on his training and experience, were common to collectors of material containing bestiality and child pornography:

> 1.        Bestiality and child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, address, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  One way in which these collectors communicate is through text messaging using their mobile phones.
>
> 2.        Collectors of bestiality and child pornography prefer have [sic] continuous access to their collection of child pornography. Therefore, they normally keep their phones, which often store a portion of this material close at hand.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world[.]
>
> 3.        Collectors of bestiality and child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  bestiality [sic] and child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

16

> 4.      Likewise, collectors of bestiality and child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

(Exhibit 1 at 4-5 (affidavit ¶¶ 1-4).)

In other words, based on Detective Getz's training and experience, there were certain characteristics that are shared by collectors of child pornography and bestiality.

The affidavit in support of the Ping Order identified the complaining witness as "Jane Doe." (*See* Exhibit 1 at 5.)  Detective Getz would testify that Ms. Doe was identified in this fashion at her request and because she was embarrassed about her intimate relationship with the Defendant and Angela.  Detective Getz would also testify that he recalls Ms. Doe expressing fear of reprisal if her allegations regarding the Defendant and Angela became public.

The Ping Order was issued on January 29, 2015, by a Marion Superior Court Commissioner.  (Exhibit 1 at 2-3.)  After he obtained the Ping Order, Detective Getz faxed the order to AT&T (the Defendant's cell phone provider) and Sprint (Angela's cell phone provider).  AT&T sent Detective Getz a response confirming receipt of the Ping Order and stating that it would send mobile location data to Detective Getz's ISP email address.  (Exhibit 4, Precision Location Data Received from AT&T Pertaining to the -0661 Phone, at 1.)

On or about February 2, 2015, AT&T provided Detective Getz with call detail records for the Defendant's cell phone (hereinafter the "-0661 Phone") from January 29, 2015 through February 2, 2015 (Exhibit 3, Call Detail Records Received from AT&T Pertaining to the -0661 Phone), as well as subscriber information for the -0661 Phone (Exhibit 2, Subscriber Information Received from AT&T Pertaining to the -0661 Phone).  According to the subscriber information,

17

the financially liable party was the Jared Foundation, Inc., at 4578 Woods Edge Drive, Zionsville, Indiana, with a contact home email address of Russell.Taylor@yahoo.com, the billing party was the Jared Foundation, Inc., at 4578 Woods Edge Drive, Zionsville, Indiana, and the user was Jared Fogel at 4578 Woods Edge Drive, Zionsville, Indiana, with a contact home email address of Russell.Taylor@yahoo.com.  (Exhibit 2 at 1.)  At the time of his arrest, the Defendant worked as the Executive Director of the Jared Foundation, Inc. – the charitable foundation established by Jared Fogle.

AT&T began sending mobile location data for the -0661 Phone to Detective Getz by email on February 2, 2015.  (*See* Exhibit 4 at 6.)  Some of the mobile location data for the -0661 Phone was a notification:

> Unable to obtain position information[.]  This could be a result of the mobile being powered off, out of the service area or in an area where location information is not currently available.  We will continue to send updates as agreed.

(*Id.*)  Detective Getz also received mobile location data for the -0661 Phone that provided latitude, longitude, and radius data.  (*See, e.g.* Exhibit 4 at 35.)  When Detective Getz received emails containing this data, he will testify that he entered the coordinates into Google Earth.  When he did so, the coordinates were for an area near the intersection of West Morris Street and South Raceway Road in Indianapolis – essentially in the backyard of the residence that the Defendant and Angela shared at 1304 Salem Creek Boulevard.

Detective Getz will testify that he did not plot every single set of latitude and longitude data that he received from AT&T because he realized that he was receiving essentially the same set of coordinates over and over.  Nor did Detective Getz save every email with mobile location data that he received from AT&T.  Detective Getz deleted some of these emails because they were either "unable to obtain position location" notifications or essentially the same set of latitude and

18

longitude coordinates that he plotted as being in the backyard of 1304 Salem Creek Boulevard. Recently, when the Government realized that the AT&T mobile location data was incomplete, it attempted to obtain a complete set of mobile location data from AT&T and/or from ISP.  When this effort was not successful, the Government requested and received a search warrant to collect historical cell site location data from AT&T for the -0661 Phone.  The historical cell site location data confirms Detective Getz's recollection that the -0661 Phone was most frequently located in the area of 1304 Salem Creek Boulevard or at other locations associated with the Defendant. Notably, the -0661 Phone was never seen at the 4578 Woods Edge Drive address listed in the AT&T subscriber information.  As such, the historical cell site location data confirmed Detective Getz's 2015 conclusions that the user of the -0661 Phone was the Defendant and that the Defendant resided at 1304 Salem Creek Boulevard in Indianapolis.

The Ping Order was terminated on February 10, 2015.  (*See* Exhibit 4 at 4-5.)  Thereafter, Detective Getz began drafting a search warrant for the residence at 1304 Salem Creek Boulevard. The residential search warrant was issued by a Marion Superior Court Judge on April 23, 2015 (the "April 23 Search Warrant").  (Exhibit 5, April 23, 2015 Search Warrant.)  Detective Getz was the affiant for the April 23 Search Warrant, which included sections entitled "Computers and Child Pornography" (Exhibit 5 at 10-12) and "Characteristics of Individuals who Receive and Collect Images of Child Pornography" (*id.* at 12-14).  In those sections, Detective Getz identified various characteristics of individuals who produced, distributed, collected, accessed, and/or viewed child pornography.  Detective Getz would testify that, as he said in support of the Ping Order, based on his training and experience, collectors of child pornography and collectors of bestiality material have numerous characteristics in common.  Further, such a conclusion is a natural inference given the illegal and taboo nature shared by both activities.

Detective Getz described the subscriber information that he received from AT&T regarding the -0661 Phone as "a cell phone number assigned to the Jared Foundation Inc. Russell Taylor serves as executive director of the Jared Foundation." (Exhibit 5 at 21 (affidavit ¶ 32).) A more thorough description of the subscriber information would have been that the financially liable party was the Jared Foundation, Inc., at 4578 Woods Edge Drive, Zionsville, Indiana, with a contact home email address of Russell.Taylor@yahoo.com, the billing party was the Jared Foundation, Inc., at 4578 Woods Edge Drive, Zionsville, Indiana, and the user information was listed as Jared Fogel at 4578 Woods Edge Drive, Zionsville, Indiana, with contact home email address of Russell.Taylor@yahoo.com. (*See, e.g.*, Exhibit 2.)

The April 23 Search Warrant affidavit concluded by stating that there was probable cause to believe that Indiana Code § 35-46-3-14, which prohibits bestiality, and Indiana Code § 35-42-4-4, which prohibits the possession of child pornography, had been violated and that "property, evidence, fruits, and instrumentalities of these offenses" were located at 1304 Salem Creek Boulevard. (Exhibit 5 at 22 (affidavit ¶ 34).)

The April 23 Search Warrant was executed at 1304 Salem Creek Boulevard on April 29, 2015. During the search, law enforcement officers found child pornography on multiple electronic devices in the residence, including images and videos that appeared to have been created in the residence. Based on the camera angles of some of the videos, officers determined that there were likely hidden cameras in the house. Upon discovering images and videos of child pornography, Detective Getz requested, and was granted, a second search warrant permitting law enforcement officers to examine "all items seized by authority of the previous search warrant" and "to search all seized items for evidence of child exploitation/child pornography in violation of I.C. code 35-42-4-4." (Exhibit 6, April 29, 2015 Search Warrant, at 22.) This search warrant (the "April 29

20

Search Warrant) was signed by a different Marion County Superior Court judge on April 29, 2015. Unsurprisingly, forensic examination of the electronic devices seized from the 1304 Salem Creek Boulevard residence revealed evidence of the sexual exploitation of multiple minor children and the production, possession, and distribution of child pornography.

## LEGAL STANDARD

This Court possesses wide discretion in deciding whether to grant a motion *in limine* regarding the admission, exclusion, or preclusion of evidence. *United States v. Williamson*, 202 F.3d 974, 978 (7th Cir. 2000); *see also United States v. Holt*, 486 F.3d 997, 1000-01 (7th Cir. 2007). Reviewing for abuse of discretion, the Seventh Circuit will reverse only "when no reasonable person could take the view of the trial court." *United States v. Gibson*, 170 F.3d 673, 680 (7th Cir. 1999) (quotation omitted).

When a search is authorized by a warrant signed by a neutral magistrate, a reviewing court must "give 'great deference' to the issuing judge's conclusion that probable cause has been established." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (quoting *United States v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008)). In other words, a reviewing court must "defer to the issuing judge's initial probable cause finding if there is 'substantial evidence in the record' that supports the decision." *Id*. (quoting *United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002)).

> [The] magistrate's determination of probable cause . . . should be overruled only when the supporting affidavit, read as a whole in a realistic an common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.

*United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000) (citing *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)). So-called "doubtful" cases should be resolved in favor of upholding the warrant. *Id*.

21

A search warrant establishes probable cause when "it sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *Id.* (citing *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005)). The issuing magistrate simply must "make a practical, common sense decision" that probable cause exists. *Id*. (citing *Koerth*, 312 F.3d at 866). Warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site, and courts are entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense. *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009) (citation omitted).

Probable cause is a "flexible, common-sense standard." *Florida v. Harris*, 568 U.S. 237, 240 (2013) (citing *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "The test for probable cause is not reducible to precise definition or quantification" and is not a "[f]inely tuned standard[]." *Id*. (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Gates*, 462 U.S. at 235). Thus, probable cause requires merely a "fair probability" that contraband or evidence of a crime is present. *Id*. (citing *Gates*, 462 U.S. at 238; *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality)). Probable cause is not vitiated by negligent or innocent mistakes. *United States v. Smith*, 715 F.3d 1110, 1118 (8th Cir. 2013). Nor do erroneous assumptions based on information received by the officer amount to the reckless inclusion of false statements in an affidavit. *United States v. Smith*, 588 F.2d 737, 739-40 (9th Cir. 1978), *cert. denied*, 440 U.S. 939 (1979). Finally, probable cause exists even if the officer made a good faith mistake and that mistake is what led to probable cause. *See, e.g.*, *Herring v. United States*, 555 U.S. 135, 146 (2009) (declining to suppress evidence obtained from search incident to arrest on warrant that was subsequently found to have been recalled); *United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir. 2007) (probable cause for traffic stop when officer in good faith believed that the defendant was not wearing a seatbelt).

**ARGUMENT**

Here, the searches of the residence at 1304 Salem Creek Boulevard were authorized by 2 search warrants, signed by 2 different magistrates, both of which established probable cause. As such, the Government should be permitted to admit the evidence seized pursuant to the April 23 Search Warrant and the April 29 Search Warrant during its case-in-chief at trial.

In 2014 and 2015, Detective Getz's investigation revealed that the Defendant and Angela were committing the Indiana state offenses of bestiality and possession of child pornography. Because the investigation was into joint criminal activity, probable cause that either participant – or both participants – were committing the crimes of bestiality or possession of child pornography, and that evidence of those crimes would be found at 1304 Salem Creek Boulevard, justifies the April 23 Search Warrant. Put another way, the April 23 Search Warrant was validly issued if: (1) there was probable cause to believe that Angela was engaged in bestiality or possession of child pornography and that evidence of those crimes would be found at 1304 Salem Creek Boulevard; (2) there was probable cause to believe that the Defendant was engaged in bestiality or possession of child pornography and that evidence of those crimes would be found at 1304 Salem Creek Boulevard; (3) there was probable cause to believe that the Defendant and Angela were jointly engaged in bestiality or possession of child pornography and that evidence of those crimes would be found at 1304 Salem Creek Boulevard; or (4) any combination of the foregoing.

**A.      The April 23 Search Warrant Affidavit Established Probable Cause that Angela was Committing Bestiality and that Evidence of Bestiality was Located at 1304 Salem Creek Boulevard**

The April 23 Search Warrant affidavit was replete with facts establishing probable cause that Angela was engaging in bestiality and that evidence of bestiality would be found at 1304 Salem Creek Boulevard.

As an initial matter, a complaining witness, Jane Doe, stated that Angela was engaging in bestiality. Ms. Doe was credible and her statements, by themselves, provided probable cause for the April 23 Search Warrant. Indeed, the Seventh Circuit has held that:

> The proper focus – when a citizen witnesses a crime and notifies the police – is whether the information related to the police must be corroborated by them before they have probable cause to stop a suspect and search his automobile. The issue was addressed in *Gramenos v. Jewel Cos.,* 797 F.2d 432 (7th Cir.1986), *cert. denied,* 481 U.S. 1028 (1987). In that case, we held that "[w]hen an officer has 'received his information from some person – normally the putative victim or an eye witness – who it seems reasonable to believe is telling the truth' . . . he has probable cause." *Id.* at 439 (citation omitted). Thus, if it seems reasonable to the police to believe that the eyewitness was telling the truth, they need not take any additional steps to corroborate the information regarding the crime before taking action.

*United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir. 1991). Here, Ms. Doe was a witness to a crime – specifically the Indiana State offense of bestiality – when she received an image of a woman identified as Angela engaging in bestiality with a dog. Upon receiving that image, Ms. Doe immediately reported it to Master Trooper Etter. Days later, Ms. Doe reaffirmed her concerns to Detective Getz, and also explained why she believed it was Angela in the picture. Accordingly, probable cause that a violation of Ind. Code § 35-46-3-14 had been committed had been established through Ms. Doe's statement.

Even if this Court were to analyze the information provided by Jane Doe under the less deferential informant standard, probable cause is still established. In this case, the Court's analysis would encompass an evaluation of the following factors: (1) the extent to which the police corroborated the informant's statements; (2) the degree to which the informant acquired knowledge of the events through firsthand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and the police officer's application for the search

24

warrant. *Sims*, 551 F.3d at 644 (citing *United States v. Jones*, 208 F.3d 603, 609 (7th Cir.2000)). These factors easily weigh in favor of probable cause.

Detective Getz and other law enforcement officers corroborated Ms. Doe's statements by reviewing the text messages between Ms. Doe and the Defendant and between Ms. Doe and Angela. The text messages, including the links to bestiality websites and the image of bestiality sent on September 20 and September 27, 2014, respectively, were precisely as Ms. Doe described. Ms. Doe also provided a basis for her knowledge of Angela's anatomy and explained why she believed that the woman engaging in bestiality in the image that she received on September 27 was Angela. Even if it turns out that the woman in the photograph was not ultimately Angela, a good faith mistake does not invalidate probable cause. *Dowthard*, 500 F.3d at 569.

Moreover, a review of the text messages between Ms. Doe and "Angela-Russ" further corroborated Angela's interest in bestiality. On June 21, 2014, Ms. Doe received text messages from "Angela-Russ" about engaging in sexual activity with horses, specifically: "Get that horse cock ready for me . . . ." (Exhibit 8 at 6 (messages 103-04; *see also* Exhibit 5 at 19.)

Detective Getz also conducted surveillance of the residence at 1304 Salem Creek Boulevard, which revealed 2 vehicles in registered to Angela parked in the driveway. He also confirmed with the United States Postal Service that Angela received mail at 1304 Salem Creek Boulevard.

In sum, there was undoubtedly probable cause to believe that Angela was engaging in bestiality and that evidence of bestiality would be found at 1304 Salem Creek Boulevard.

**B.     The April 23 Search Warrant Established Probable Cause that the Defendant was Committing Bestiality and Possession of Child Pornography and that Evidence of Those Crimes was Located at 1304 Salem Creek Boulevard**

Not only did the April 23 Search Warrant affidavit establish probable cause to believe that Angela was engaging in a crime (or crimes) and that evidence of those crimes would be found at 1304 Salem Creek Boulevard, the search warrant affidavit also established probable cause to believe that the Defendant was engaging in bestiality and possession of child pornography and that evidence of those crimes would be found at 1304 Salem Creek Boulevard.

Again, Ms. Doe's statements, by themselves, established probable cause that the Defendant was engaging in criminal conduct and that evidence of such conduct would be found at the Defendant's residence.  As previously noted, the proper focus in a case, such as this, where a citizen witnesses a crime and notifies the police is "whether the information related to the police must be corroborated by them before they have probable cause . . . ." *Decoteau*, 932 F.2d at 1207. The Seventh Circuit has repeatedly held that "[w]hen an officer has received his information from some person – normally the putative victim or an eye witness – who it seems reasonable to believe is telling the truth . . . he has probable cause." *Gramenos*, 797 F.2d at 439, *cert. denied* 481 U.S. 1028 (1987).  "Thus, if it seems reasonable to the police to believe that the eyewitness was telling the truth, they need not take any additional steps to corroborate the information regarding the crime before taking action." *Decoteau*, 932 F.2d at 1207.  Here, however, Detective Getz *did* take additional steps to corroborate the information provided by Ms. Doe.  As such, there was undoubtedly probable cause supporting the April 23 Search Warrant.  This is also true if Ms. Doe is treated under the less-deferential informant standard.

Again, as previously noted, Detective Getz and other law enforcement officers corroborated Ms. Doe's statements by reviewing the text messages between Ms. Doe and the

Defendant and between Ms. Doe and Angela. The text messages, including the links to bestiality websites and the image of bestiality sent on September 20 and September 27, 2014, respectively, were precisely as Ms. Doe described.

And there was much more evidence than just Ms. Doe's statement and the corroborative text messages. In addition to reviewing the text messages, Detective Getz would testify that he also compared a selfie-style photograph that the Defendant sent to Ms. Doe on September 27, 2014, with the Defendant's driver's license photograph and concluded that the Defendant was the person depicted in the selfie-style photograph. Once Detective Getz made his initial determination that it was the Defendant who was distributing images of his wife engaging in bestiality and who was offering to send images of young girls engaging in sexually explicit conduct, Detective Getz then performed surveillance on the residence listed on the Defendant's driver's license and confirmed with the United States Postal Service that the Defendant and Angela received mail at 1304 Salem Creek Boulevard.

Detective Getz's surveillance of the residence at 1304 Salem Creek Boulevard revealed 2 vehicles in Angela's name parked in the driveway. Again, at this point, Detective Getz had more than enough evidence establishing probable cause to search the house. He had seen images of a woman identified as Angela engaging in bestiality and he had observed Angela's vehicles parked at an address linked to both her and the Defendant. Probable cause at that point existed that evidence would be found at the residence. Ms. Doe had already received an image depicting bestiality, so Detective Getz reasonably believed that other such evidence of the crime existed at the residence. Moreover, given the taboo (and criminal) nature of the activity, it was reasonable for both Detective Getz and the issuing magistrate to assume that evidence of the crime of bestiality would be stored at the location where the suspects felt most comfortable – their residence. *Orozco*,

27

576 F.3d at 749 (stating that search warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site and courts are entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense).

But Detective Getz did not stop there.  He also obtained cell phone records, including mobile location records, for the -0661 Phone – the phone that had sent the bestiality image and links and the phone that had offered to send Ms. Doe images of "young girls."  These mobile location records further tied the -0661 Phone to 1304 Salem Creek Boulevard.

Next, Ms. Doe's knowledge of the Defendant's sexual proclivities was based on her firsthand observation of the Defendant's sexual interests and desires.  Indeed, Ms. Doe had participated in "swinger-type" sexual activity with the Defendant, Angela, and another couple. Ms. Doe stated that she had known the Defendant since approximately 2006, and had reconnected with him in late 2013 or early 2014.  Ms. Doe identified the Defendant and Angela as the people who had communicated with her regarding bestiality, and she identified the Defendant (who's contact information in Ms. Doe's cell phone was "Russ Taylor") as the person who had sent her links to bestiality-related websites, an image of a woman engaging in bestiality, and offered to send her images of "young girls."  The text messages themselves are full of self-identification including the Defendant and Angela identifying themselves and each other by name.  (*See generally* Exhibit 7; Exhibit 8.)  Thus, not only did Ms. Doe have firsthand information but Detective Getz also adjudged her to be credible because everything she told him was supported by her text messages and because the information she was disclosing to him was embarrassing to her.

Furthermore, Ms. Doe provided a great deal of detail during her interview with Detective Getz and Sergeant Cecil.  This further bolstered her credibility and supports probable cause.

28

Finally, Ms. Doe first reported her concerns to a friend in September 2014, and she was interviewed by Detective Getz in October 2014.  After that interview, Detective Getz corroborated Ms. Doe's report and collected additional evidence before swearing out the April 23 Search Warrant.

In short, Ms. Doe's statement, by itself, provided probable cause to search the residence at 1304 Salem Creek Boulevard.

But, as previously noted, the magistrate judge who authorized the April 23 Search Warrant had more than just Ms. Doe's statement.  By April 2015, Detective Getz had reviewed the text messages between Ms. Doe and the Defendant and Ms. Doe and Angela that also established probable cause for the search.  In those text messages, the Defendant discussed sexual encounters with animals, sent Ms. Doe links to bestiality-dedicated websites, and provided her with a photograph of a woman engaging in sexual activity with a dog, which he described as "Angie with her ex's dog."  The Defendant also offered to send Ms. Doe images of "young girls" and alluded to having traveled to Thailand – a country known for sex tourism.  The April 23 Search Warrant affidavit also included language from which the magistrate judge could infer that people engaged in bestiality or who possessed child pornography would keep evidence of their conduct in their home.

In sum, there was abundant evidence establishing a "fair probability" that evidence, fruits, and instrumentalities of violations of Ind. Code § 35-46-3-13, which prohibits bestiality, and/or Ind. Code § 35-42-4-4, which prohibits possession of child pornography, would be found at 1304 Salem Creek Boulevard.  As such, the magistrate judge could reasonably have found probable cause supporting the April 23 Search Warrant.

**C.**     **The April 23 Search Warrant Established Probable Cause that the Defendant and Angela Together were Committing Bestiality and Possession of Child Pornography and that Evidence of Those Crimes was Located at 1304 Salem Creek Boulevard**

For the reasons set forth above, there was also probable cause to believe that the Defendant and Angela together were engaging in bestiality or possessed child pornography and that evidence of those crimes would be found at 1304 Salem Creek Boulevard.

**D.**     **Mistakes in the April 23 Search Warrant do not Undermine Probable Cause**

As explained above, the April 23 Search Warrant (as well as the Ping Order and the April 29 Search Warrant) all described Ms. Doe as a "friend" of Master Trooper Patrick Etter. This statement was based on Detective Getz's conversations with both Master Trooper Etter and with Ms. Doe. And, while the statement was true at the time, at some point, Master Trooper Etter's relationship with Jane Doe became romantic. Under *Franks v. Delaware*, 438 U.S. 154 (1978), a search warrant must be invalidated only if the defendant shows, by a preponderance of the evidence, that the evidence supporting the warrant contained a material false statement made intentionally or with reckless disregard for the truth *and*, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause. Here, it does not even appear that the characterization of Ms. Doe as a "friend" as opposed to a "romantic partner" was a material false statement. And, even if it was, the statement was not made intentionally or with reckless disregard for the truth. Moreover, even if the characterization of Ms. Doe was changed from "friend" to "romantic partner" in the search warrant affidavit, there would still have been probable cause for the April 23 Search Warrant because, under either description, Ms. Doe was a citizen-witness whose information was corroborated by the police.

The incomplete mobile location data similarly does not undermine probable cause. As previously noted, Detective Getz did not save every email he received from AT&T that contained

mobile location data.  In early 2015, when he was receiving the mobile location data, Detective Getz deleted emails that were either notifications that AT&T was "unable to obtain position location" or because the latitude and longitude coordinates he received geolocated to the same area behind 1304 Salem Creek Boulevard.  But this does not undermine the veracity of the statement: "Mobile locator results placed the phone in the area of 1304 Salem Creek Boulevard."  (Exhibit 5 at 21 (affidavit ¶ 32).)  Moreover, once the Government realized that the AT&T mobile location data was incomplete, it collected historical cell site location data for the -0661 Phone.  The historical cell site location data confirms that the statement in the April 23 Search Warrant affidavit was true – the -0661 Phone *was* placed in the area of 1304 Salem Creek Boulevard.  Thus, there is no material false statement.  And, even if there was, the statement was not made intentionally or with reckless disregard for the truth.

Finally, the characterization of the AT&T subscriber information for the -0661 Phone also does not undermine probable cause for the April 23 Search Warrant.  Detective Getz has conceded that he inadvertently mischaracterized the subscriber information that he received from AT&T regarding the -0661 Phone when he stated that the -0661 Phone was "a cell phone number assigned to the Jared Foundation Inc.  Russell Taylor serves as executive director of the Jared Foundation." (Exhibit 5 at 21 (affidavit ¶ 32).)  If this Court were to view that statement as misleading, then the Court is directed to analyze the April 23 Search Warrant for probable cause as if the statement were never included.  *See, e.g.*, *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006) (stating that if probable cause for the search had existed irrespective of the affiant's alleged errors, then a *Franks* hearing would have been unnecessary).  As explained above, probable cause existed without this statement thus, removing the statement does nothing to change the probable cause finding.

31

Exclusion is a "bitter pill" used "only as a last resort" that "exacts a heavy toll on both the judicial system and society at large" because it "suppress[es] the truth," and thus often "set[s] the criminal loose in the community without punishment." *Davis v. United States*, 564 U.S. 229, 237 (2011) (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).  The sole purpose of excluding evidence is to "deter future Fourth Amendment violations."  *Id*.  But deterrence must also "outweigh" the "substantial social costs" associated with exclusion.  *Id*. (citing *United States v. Leon*, 468 U.S. 897, 907 (1984)).  Here, exclusion is simply not the appropriate remedy because, despite sloppy drafting, there was ample probable cause to support the April 23 Search Warrant.

**E.      The April 29, 2015 Search Warrant Similarly Established Probable Cause**

The second search warrant, which Detective Getz requested after law enforcement officers found "multiple video files of minor children in a bedroom and bathroom" during the search of 1304 Salem Creek Boulevard, similarly established probable cause.  (Exhibit 6 at 22.)  Many of the videos showed the exposed genitalia of the children and appeared to have been created in the residence.  (*See id.*)

The search for, and seizure of, this evidence was authorized under the April 23 Search Warrant.  (Exhibit 5 at 1-3.)  Accordingly, it is admissible for the reasons set forth above.

However, out of an abundance of caution, Detective Getz applied for a second warrant based upon the video files discovered pursuant to both the April 23 Search Warrant and the plain view doctrine.  When "police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character," they may seize that evidence under the plain view doctrine. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).

In sum, both search warrants easily established probable cause and the evidence seized pursuant to these warrants should be admitted at trial.

## CONCLUSION

Based on the foregoing, the Government respectfully requests that the Court grant the Government's Third Motion *in Limine* and permit the Government to admit the evidence seized from 1304 Salem Creek Boulevard in April 2015 during its case-in-chief.

Respectfully submitted,

JOHN E. CHILDRESS
Acting United States Attorney

By:    s/ Kathryn E. Olivier
Kathryn E. Olivier
Bradley P. Shepard
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2021, a copy of the foregoing was electronically filed. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Zachary Lee Newland
zach@gordondefense.com

Jeremy Gordon
jeremy@gordondefense.com

s/ Kathryn E. Olivier
Kathryn E. Olivier
Assistant United States Attorney

Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204
Telephone: 317-226-6333
Email:  Kathryn.Olivier@usdoj.gov